No. 22319.

Donald J. Alexander and George T. Rochford, Jr., v. The First National Bank in Fort Collins, a national BANKING ASSOCIATION.

(455 P.2d 861)

Decided June 9, 1969.     Rehearing denied July 14, 1969.

GIRSH and ROTTMAN, SOLOMON GIRSH, for plaintiffs in error.

FISCHER, FISCHER and BEATTY, WARD FISCHER, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE KELLEY.

DONALD J. ALEXANDER and George T. Rochford, Jr., plaintiffs in the trial court, sued out a writ of error challenging judgments *non obstante veredicto* granted on motions of the defendant The First National Bank in motions of the defendant The First National Bank in Fort Collins (the bank) following jury verdicts favorable to each of the plaintiffs.

Before detailing the intricacies of the procedural background pertinent to the disposition of this cause, a statement of the facts out of which the lawsuit arose is in order.

The plaintiffs conceived the idea of forming a company to fabricate steel pipe at Fort Collins and were instrumental in organizing (1961) and promoting for this purpose Timberline Tube, Inc., a Colorado corporation. Each plaintiff had identical interests in Timberline, which interests were the result of their efforts and a small cash investment. Bosworth, Sullivan & Company, an investment banking firm, a defendant in the trial court, but not a party here, actually put Timberline together financially. Besides investing a substantial amount of its own funds and inducing others to participate with equity capital, it arranged for a $500,000 line of credit with the Colorado National Bank. After a short period of operation the stockholders, other than plaintiffs, in order to provide additional operating capital, loaned Timberline $800,000 as evidenced by "subordinated notes." By their terms these notes were subordinated to claims of general creditors and also to amounts advanced by Colorado National Bank.

In June 1962, Timberline Tube started producing pipe. By November 1962, additional capital in the amount of $297,000 was needed. The stockholders, including the plaintiffs, contributed an amount proportionate to their stock interest in the company. Plaintiffs, owners of a ten per cent interest, in order to contribute their ten per cent, each borrowed $29,700 from the bank (actually they borrowed $30,000; the $300 balance was used to buy additional corporate stock). Timberline issued what were denominated "Senior subordinated notes" in the amount of $297,000. As evidence of their contribution the plaintiffs each received from Timberline a note for $29,700, which they in turn pledged to the bank, together with all of their stock, as collateral security for their respective loans.

By the early part of 1963 the company was again in need of operating capital, having lost up to this time almost $500,000. The stockholders, not being interested in putting in additional capital, sought a purchaser and found one in Southwestern Pipe, Inc., a Texas corporation (the Texas corporation).

Under the terms of the purchase contract (the Definitive Agreement) the stockholders of Timberline, including the plaintiffs, *conditionally* transferred to the Texas corporation all of their Timberline stock; received in return Series A and B notes of the Texas corporation, which notes were payable *only in the event* that the Texas corporation did not elect to return Timberline to the stockholders. The Definitive Agreement granted to the Texas corporation the option of returning the Colorado corporation to its stockholders, including the plaintiffs, within two years from April 17, 1963. Upon acquisition, the Texas corporation, pursuant to agreement, amended Timberline's articles to change its name to Southwestern Pipe of Colorado (the Colorado corporation). The Series A and B notes to be issued to the former owners were in an aggregate amount equal to the book value of the stock. The plaintiffs, as their shares of the sale price, each received two notes, a Series A, 6% note, due April 16, 1973, in the amount of $5,887, and a Series B note, due April 16, 1973, in the amount of $26,659. Upon the sale of Timberline, the Series A and B notes were substituted for Timberline stock as collateral to plaintiffs' bank loans.

After operating the Colorado corporation at a loss for a period of time, during which time it put $200,000 of new capital into the business (as per Definitive Agreement), the Texas corporation indicated to the former owners that it intended to exercise its option to return the Colorado corporation to its former owners, including the plaintiffs, unless a lower sales price could be agreed upon by *all* of the former owners.

After a period of negotiation, all former stockholders,

except the plaintiffs, agreed upon a negotiated price. The plaintiffs' refusal to agree effectively forestalled consummation of the proposed agreement.

At this point in time, the Colorado corporation was indebted to the Colorado National Bank in the amount of $450,000. Under the terms of the renegotiated sale, the indebtedness to the Colorado National Bank, as well as the $297,000 original indebtedness of Timberline, which included the two $29,700 notes of the plaintiffs, were to be paid in full. The alternative, because no other purchasers could be found and because the former owners were not willing to put in the necessary additional capital to continue the plant's operation, was to liquidate the Colorado corporation. It was, under these circumstances, the considered judgment of the Colorado National Bank that its obligation was in jeopardy.

The Colorado National Bank, knowing that the First National Bank in Fort Collins held the plaintiffs' loans, which, if the Texas corporation exercised its option, would be secured only by the note and stock of Timberline, advised the Fort Collins bank of the situation.

In reaction to this news, the Fort Collins bank, on November 23, 1964, under the insecurity provisions of its notes, called upon the plaintiffs for additional security, in spite of the fact that the notes were neither due nor were they in default. The bank's letter to each plaintiff read as follows:

"We have been advised and have sufficient information in our possession that causes us to determine, that the redemption and sale of all notes issued by Southwest Pipe of Colorado, Inc., should be submitted to the Corporation for payment. From the evidence we have and the alternatives presented by the agents for the security, we have determined that if a sale is not made pursuant to the terms set forth in a letter written by Mr. Thomas J. Hildt, Jr., this Bank would be insecure on its notes issued by you.

"We therefore must request additional security pur-

suant to the terms of the promissory note made by you and payable to us under date of June 30, 1963. If such additional security is not forthcoming within five (5) days from the date of this letter, we feel that we must proceed with the sale of the security pledged by the terms of said note at the best available price.

"I am sure you realize that any deficiency resulting from such sale will be and remain your obligation."

In response to a request by counsel for the plaintiffs, the bank, on December 1, 1964, the third day after the *expiration* of the "five (5) days," advised that each plaintiff owed the bank $30,000 plus interest of $770 with interest accruing at the rate of $5 per day. On December 2, 1964, the bank sold the collateral security to plaintiffs' notes for $29,700 and accrued interest and credited plaintiffs' notes to that extent.

Although Alexander, through his mother and friends, arranged to borrow an amount in excess of $30,770, he did not tender it to the bank nor advise the bank of his intention to pay off his loan prior to its sale of his Series A and B notes to the Texas corporation on December 2, 1964. Rochford, who at the time was asking for and receiving forebearance on another loan held by the bank and secured by his home, was not able to nor did he tender any additional security.

Out of this basic factual background, the present litigation developed. Refinements, ramifications, and supplements to those facts will be mentioned as necessity dictates in the discussion and disposition of the issues.

The plaintiffs' complaint contained two claims for damages sustained by plaintiffs because of the alleged wrongful sale of their notes. The first claim was based upon an alleged conspiracy between Southwestern Pipe, Inc., (the Texas corporation), Bosworth, Sullivan & Company, Inc., and The First National Bank in Fort Collins. The jury returned a verdict for the defendants on this claim. The plaintiffs did not file a motion for new trial, so we are no longer concerned with it.

The second claim alleged that the sale of the plaintiffs' notes (with the security) for $30,467.28, was substantially less than their value; in fact, $35,000 less. Also, they alleged that the conduct of the bank in the sale of the collateral security "was attended by circumstances of fraud, malice, and a wanton and reckless disregard of the rights and feelings of" plaintiffs. As a result of the foregoing, plaintiffs each claim they sustained exemplary damages in the amount of $75,000.

On the second claim, the jury returned verdicts in favor of each plaintiff for $4,489.80 actual damages and for exemplary damages in the amount of $5,000. The jury returned verdicts in favor of the bank on its counterclaims for $300 against each plaintiff, representing the difference between the $29,700 and interest the bank had received on the sale of the notes and the $30,000 representing the face amount of the notes.

At the conclusion of the trial, both parties having rested, the plaintiffs moved for directed verdicts which were denied. The defendants, the bank and Bosworth, Sullivan & Company, Inc., then moved separately for directed verdicts. The court reserved its ruling on their motions and submitted the issues to the jury with the resulting verdicts above noted.

The bank then filed a MOTION FOR JUDGMENT NON OBSTANTE VEREDICTO (or in the alternative for a new trial) which the court took under advisement. In disposing of the bank's motion, the trial court first considered the defendants' motions for directed verdicts which it had previously reserved. No motion for new trial was filed by the plaintiffs in reference to the verdicts for the bank on its counterclaims, hence the motions for directed verdicts thereon were moot. The verdicts likewise made the motions moot as to plaintiffs' first claim.

The court then stated:

"With reference to the motions as directed against the second claim for relief, the Court is forced to the con-

clusion that these motions should have been granted at the conclusion of all of the evidence. This is apparent by a review of the pertinent undisputed facts."

The court then set out the facts substantially as recited above. The court continued:

"The Plaintiffs' claim that by so selling the notes each of them was damaged substantially, and each was allowed to testify at great length concerning what might have been done with the company had the sale to the Texas corporation not been renegotiated. The evidence, however, is undisputed that no shareholder was willing to furnish, and there was no other source of, additional operating capital and that the company could not have continued production in the event that it had been returned to its former owners. The testimony is also undisputed that if the renegotiated sale had not been consummated, the company would have been turned back to the former owners.

"During the trial, Plaintiffs contended that had the plant been returned it might have been sold to another company at a higher price; but the record is devoid of evidence of any other possible sale which would have brought as much as actually received. This contention is at best highly speculative.

"Plaintiffs further contended that if all else failed the plant could have been liquidated at a price greater than that received from the renegotiated sale to the Texas company; but the highest estimate of what might have been received upon liquidation was $1,096,000.00 In view of the fact that the company owed certain obligations, to wit: $450,000.00 to the Colorado National Bank as the senior claim, $297,000.00 on senior subordinated notes which was the second claim in priority, and $800,000.00 in subordinated notes, it is obvious that the company had obligations of $1,547,000.00 which would have to be paid before any stockholder would receive anything. Since in the event of a return of the company to the former owners the Plaintiffs would be stockholders, there

would have to be received upon liquidation a sum in excess of $451,000.00 more than the highest estimate of what might have been received before the Plaintiffs, as stockholders, would be entitled to share in the liquidation proceeds; and so, under even this theory the Plaintiffs have not been damaged. (This sum of $451,000.00 is reached by subtracting the highest estimate of proceeds on liquidation, to wit: $1,096,000.00 from the preferred obligations of the company, to wit: $1,547,000.00.)"

The plaintiffs, in a two part motion, moved (1) to alter or amend the judgment *non obstante veredicto* by having judgments entered in favor of each of the plaintiffs against the bank in accordance with the verdicts of the jury, and (2) "that the Court rule upon the Alternative Motion for a New Trial filed by defendant, The First National Bank in Fort Collins, at the same time as its Motion for Judgment Non Obstante Veredicto."

In their brief in support of their first motion the plaintiffs assert that,

"Under Rule 50(b) of the Rules of Civil Procedure, where a decision on a motion for a directed verdict has been reserved, 'the court is deemed to have submitted the action to the jury subject to a later determination of the *legal questions raised by the motion.*' (Emphasis supplied)."

Their argument continues:

"The trial court, however, has predicated its setting aside of the jury verdicts not on any legal question, but rather upon a sufficiency of evidence as to damages and a lack of appropriate instructions as to damages."

The plaintiffs have correctly stated the rule, but they have failed to grasp the meaning of what the trial court stated in the course of ruling upon the defendant bank's motion for judgment *non obstante veredicto*. The trial court accorded plaintiffs' evidence the most favorable construction that could be given it, but held that the "pertinent undisputed facts," as a *matter of law,*

failed to prove any damages. We find no omission or misstatement of a material fact in the court's analysis of the evidence. There was, therefore, no fact question properly determinable by the jury. See, *Buchholz v. Union Pacific Railroad Company,* 135 Colo. 331, 311 P.2d 717; *Gossard v. Watson,* 122 Colo. 271, 221 P.2d 353.

The plaintiffs rely on *Burenheide v. Wall,* 131 Colo. 371, 281 P.2d 1000. This brief quotation from the opinion illustrates why the ruling in *Burenheide* is not applicable here:

"In the instant case the credibility of the plaintiff Henry J. Burenheide, plaintiffs' only witness testifying as to whether or not there was such an oral agreement; the fact that he had been impeached; the conflict in his testimony; *all are questions of fact* and not questions of law. * * *" (Emphasis added.)

In support of their second motion, that the court rule on the bank's motion for new trial, plaintiffs rely on this statement from *Grange Mutual Co. v. Golden Co.,* 133 Colo. 537, 298 P.2d 950:

"The granting of a motion for judgment non obstante veredicto does not effect an automatic denial of an alternative motion for a new trial. The trial court should have also ruled on the defendant's motion for a new trial at the same time. * * *"

*Grange Mutual Co. v. Golden Co., supra,* is readily distinguishable from the case before us. In the former opinion, contrary to the situation here, the court noted that,

"[T]here was sufficient competent evidence to support the verdict and the trial court abused its discretion in setting the verdicts aside. *French v. Haarhues* [132 Colo. 261, 287 P.2d 278], supra, cited by defendant, is applicable as to this point only where there is *no basis* to support the verdicts. * * *"

█ Logic compels us to hold that under the circumstances of this case the granting of the bank's motion for judgment *non obstante veredicto* automatically de-

nied the bank's motion for new trial. Also, see *Buren-heide v. Wall, supra,* where this court said,
"[I]t is obvious the court in granting the motion non obstante veredicto passed upon the included question of the propriety of granting a new trial."

The judgment is affirmed.

MR. JUSTICE DAY, MR. JUSTICE PRINGLE and MR. JUSTICE LEE concur.