## No. C-1763

## Great Western Producers Co-operative v. Great Western United Corporation

(613 P.2d 873)

Decided June 30, 1980.

Williams & Connolly, Jeremiah C. Collins, Daniel J. Meltzer, John W. Vardaman, Jr., Bruce R. Genderson; White and Steele, P.C., Walter A. Steele, James D. Hinga, for petitioner.

Shank, Irwin & Holmes, Hardin Holmes, Kenneth L. Starr, Michael Touff; Shank, Irwin, Conant, Williamson & Grevelle, Ivan Irwin, Jr., A. B. Conant, Jr., Robert B. Cousins, Jr., for respondent.

*En Banc.*

JUSTICE ROVIRA delivered the opinion of the Court.

We granted certiorari to consider the opinion of the Colorado Court of Appeals in *Great Western United Corporation v. Great Western Producers Co-operative,* 41 Colo. App. 349, 588 P.2d 380 (1978). We now affirm the decision of that court.

## I.
### Facts

The material facts are not in dispute. Great Western United Corporation (United) is a holding company, the principal asset of which is a wholly-owned subsidiary, the Great Western Sugar Company (Sugar Company). In 1971 and 1972, as part of a recapitalization effort, United entered into negotiations for the sale of the stock of the Sugar Company to the Great Western Producers Co-operative (Co-op), an organization comprised primarily of sugar beet producers. The Co-op had been formed in 1971 for the purpose of purchasing the Sugar Company from United.

In October 1972, after a year of negotiations, United and the Co-op entered into an agreement for the purchase of the capital stock of the Sugar Company by the Co-op. Shareholder approval of the agreement was secured, but the sale was not consummated because of outstanding lawsuits against United and because of financial difficulties experienced by the Co-op. On August 1, 1973, the 1972 agreement terminated by its own terms.

On March 22, 1974, after further negotiations, United and the Co-op executed a second purchase agreement, pursuant to which United agreed to sell, and the Co-op agreed to buy, the outstanding stock of the Sugar Company. Immediately prior to the execution of the agreement, United's investment advisor had issued an opinion letter favoring the sale, and United's board of directors had unanimously determined that it was in United's best interests to sell the Sugar Company on the terms set forth in the purchase agreement.

Because the stock of the Sugar Company was United's major asset, it was necessary that United's security holders[1] approve the sale to the Co-op.[2] Consumation of the purchase agreement was conditioned on that approval, and the agreement stated that:

"United will use its best efforts to obtain the approval of its shareholders and debentureholders whose approval is solicited."

The purchase agreement was to be "deemed terminated and abandoned by mutual consent if not consummated on or before October 1, 1974," which was the closing date.

After the agreement was executed, United prepared proxy materials and submitted them to the federal Securities and Exchange Commission. At meetings in May and July 1974, United's board of directors voted unanimously in favor of resolutions reaffirming the determination, first made in March 1974, that consummation of the purchase agreement

---

[1] As used in this opinion, the term "security holders" includes: (a) the holders of United's common stock; (b) the holders of United's $1.88 preferred stock; (c) the holders of United's $3.00 preferred stock; and (d) the holders of United's outstanding debentures.

[2] United is incorporated under the laws of the State of Delaware, and security holder approval of the purchase agreement is governed by Del. Code Ann. tit. 8, § 271(a), which provides:

"(a) Every corporation may at any meeting of its board of directors sell, lease, or exchange all or substantially all of its property and assets, including its goodwill and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or other property, including shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors deems expedient and for the best interest of the corporation, when and as authorized by a resolution adopted by a majority of the outstanding stock of the corporation entitled to vote thereon at a meeting duly called upon at least 20 days notice. The notice of the meeting shall state that such a resolution will be considered."

See section 7-9-101(2), C.R.S. 1973; *Restatement (Second) of Conflict of Laws* § 302 (1971); Reese and Kaufman, *The Law Governing Corporate Affairs: Choice of Law and the Impact of Full Faith and Credit,* 58 Colum. L. Rev. 1118 (1958); 17 *W. Fletcher, Cyclopedia of the Law of Private Corporations* § 8326 (rev. ed. 1977).

would be in United's best interests.

During the summer and fall of 1974, the price of sugar and the projected and actual profits of the Sugar Company escalated, causing a corresponding increase in the value of the Sugar Company.

On August 15, 1974, United's board of directors reviewed the price and profit increases. For the first time, the members of the board were not unanimous in favoring the sale of the Sugar Company to the Co-op. Nonetheless, a majority voted to affirm the board's prior resolutions favoring the sale.

On August 24, 1974, the board of directors met to review the matters considered on August 15. A majority of the directors in attendance voted in favor of resolutions stating that the consideration to be received by United pursuant to the purchase agreement was fair and recommending that the security holders approve the sale.

On August 28, 1974, United distributed a proxy statement to its security holders, informing them that a majority of the board of directors believed the consideration stated in the purchase agreement to be fair and equitable and that a majority of the board recommended that the security holders approve the sale. The security holders were also informed that a minority of the directors disagreed because of the increases in sugar prices and operating profits. The August 28 proxy statement included a solicitation by United of proxies in favor of the purchase agreement.

Shortly after September 9, 1974, United's president learned that at least one-half of the members of the board of directors no longer favored the terms of the purchase agreement. Accordingly, United suspended proxy solicitation based on the information supplied to the security holders in the August 28 proxy statement.

A special meeting of the board of directors was held on September 14, 1974. At that meeting, the board voted to accept a revised, higher projection of sugar prices and operating revenues. On the basis of that vote, United's investment advisor withdrew its opinion favoring the terms of the purchase agreement. Two resolutions were adopted by a majority of the board of directors. The first recommended that the security holders disapprove the purchase agreement since the board no longer thought the consideration stated in the agreement to be fair. The second directed United's management to continue solicitation of proxies in favor of the purchase agreement "in view of the Corporation's obligations to the Co-Operative."

Meanwhile, on September 9 and 11, 1974, two shareholder derivative suits had been filed in the United States District Court for the Southern District of New York, alleging that the August 28 proxy statement violated both federal securities laws and the common law fiduciary duties of United's board of directors. On September 19, 1974, after learning of the September 14 change in the directors' recommendation to the security holders, the federal judge before whom the derivative suits had been filed

entered a temporary restraining order enjoining United from using the proxies which it had received pursuant to the August 28 proxy statement. On September 20, 1974, the federal judge was further informed that United intended to continue proxy solicitation in favor of the purchase agreement, even though the revised proxy materials through which the favorable votes would be solicited would state that a majority of the board of directors had recommended that the security holders disapprove the purchase agreement. The judge enjoined the use of United's revised proxy materials, taking notice of the probability that United's security holders would erroneously assume that unmarked proxies would be voted consistently with the recommendation of the board of directors, *i.e.*, again rather than for the purchase agreement.

Proxy solicitation in favor of the purchase agreement was never resumed. On September 20, 1974, United distributed a supplemental proxy statement advising the security holders that the board of directors recommended against the sale of the Sugar Company and that unmarked proxies would be voted consistently with that recommendation. On September 30, 1974, the security holders' meeting was held. Sufficient votes were not obtained to approve the purchase agreement.

## II.
### *Disposition in the Trial Court*

United brought an action in the trial court, seeking a declaratory judgment that the purchase agreement had been terminated and abandoned by mutual consent of the parties. The Co-op counterclaimed, alleging a breach by United of its "best efforts" obligation under the purchase agreement.

With respect to the counterclaim for breach of contract, the trial court instructed the jury that it must return a verdict for United unless it found by a preponderance of the evidence that: (a) United contracted to use its best efforts to obtain security holder approval of the sale of the Sugar Company; (b) United "failed to so use its best efforts"; (c) "but for United's failure to use its best efforts, its shareholders and debentureholders, each having full knowledge of the facts, would have approved the proposed sale"; and (d) the Co-op incurred damages as a result of United's failure to comply with its "best efforts" obligation.

The jury returned a verdict in favor of United on the Co-op's counterclaim.

## III.
### *Disposition in the Court of Appeals*

The court of appeals affirmed the jury verdict, holding that the trial court should have granted United's motion for a directed verdict on the Co-op's counterclaim. The appellate court reasoned that: (1) the purchase agreement required United to exercise only its "best lawful efforts" to obtain security holder approval of the sale of the Sugar Company; (2)

both federal and state law obligated United and its board of directors "to inform the security holders that, because of the change in circumstances [*i.e.,* the increases in sugar prices and profits and the corresponding increase in the value of the Sugar Company], they believed the terms for the sale of the Sugar Company were no longer fair and equitable"; and (3) the September 14, 1974, reversal in the recommendation of United's board of directors to its security holders could not therefore constitute evidence of a breach of the "best efforts" clause.

On certiorari review, the Co-op contends that the court of appeals erred in holding that the trial court should have granted United's motion for a directed verdict on the Co-op's counterclaim, because a reasonable jury could have found that the September 14, 1974, change in the recommendation of the board of directors to the security holders constituted a breach by United of its "best efforts" obligation. Because we affirm the decision of the court of appeals on the issue of whether the trial court should have directed a verdict in United's favor, we need not consider errors assigned by the Co-op to the trial court's instructions and evidentiary rulings.

## IV.

Although this case involves a transaction of some complexity, the issue presented for review, as we perceive it, is well defined and narrow. That issue is whether the "best efforts" clause contained in the March 22, 1974, purchase agreement prevented or prohibited United's board of directors from reversing their original recommendation that United's security holders approve the sale of the stock of the Sugar Company. The co-op argues that such a limitation was placed on the directors and that the "best efforts" obligation was therefore breached on September 14, 1974, when the board of directors reversed its prior recommendation favoring the purchase agreement.[3] We disagree.

-----

[3] It is undisputed that the directors reversed their prior recommendation. Stated in procedural terms, therefore, the issue before the trial court on United's motion for a directed verdict was whether the evidence of the reversal of position proved, as a matter of law, that United had breached the "best efforts" obligation. *See Alexander v. First National Bank in Fort Collins,* 169 Colo. 252, 455 P.2d 861 (1969).

The Co-op does not challenge the propriety of United's disclosure to the security holders of the fact that the September 14, 1974, reversal in the directors' recommendation had occurred (this disclosure was made in the supplemental proxy materials distributed to the security holders on September 20, 1974). Because the Co-op has raised no claim with respect to the disclosure effected by the supplemental proxy materials, we discuss neither the federal Securities and Exchange Act of 1934 nor the regulations adopted pursuant to that Act, except to note that SEC rule 14a-9, 17 C.F.R. § 240.14a-9 (1979), prohibits proxy solicitation through materials containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

In the absence of evidence justifying a contrary inference, it will be presumed that the parties to a contract intended to form a lawful and enforceable agreement. *Atchison v. City of Englewood,* 170 Colo. 295, 463 P.2d 297 (1970); *Standard Marine Insurance Company v. Peck,* 140 Colo. 56, 342 P.2d 661 (1959); *Wyatt v. Larimer & Weld Irrigation Company,* 18 Colo. 298, 33 P. 144 (1893); *Restatement of Contracts* § 236(a) (1932); 3 *Corbin on Contracts* § 546 (1960). On the basis of this rule, we conclude that United and the Co-op did not intend that the "best efforts" clause would impose on United's board of directors any obligation which would conflict with the directors' legal duties to the corporation's security holders. These duties include fidelity, good faith, and prudence with respect to the interests of security holders, as well as the duty to exercise independent judgment with respect to matters committed to the discretion of the board of directors and lying "at the heart of the management of the corporation." *Chapin v. Benwood Foundation, Inc.,* 402 A.2d 1205, 1210 (Del. Ch. 1979); *Abercrombie v. Davies,* 35 Del. Ch. 599, 123 A.2d 893 (1956), *rev'd. on other grounds,* 36 Del. Ch. 371, 130 A.2d 338 (Del. St.Ct. 1957); *University Computing Company v. Lykes-Youngstown Corporation,* 504 F.2d 518 (5th Cir. 1974); Del. Code Ann. tit. 8, § 141(a) (Supp. 1977).[4] Pursuant to § 271(a) of the "General Corporation Law of the State of Delaware,"[5] United's directors were required to determine whether the terms, conditions, and consideration set forth in the 1974 purchase agreement were "expedient and for the best interests of the corporation." In our view, the determination required by § 271(a) lies "at the heart" of the directors' corporate management duties, and the directors may not lawfully agree to abrogate the continuing duty to exercise their independent judgment with respect to that determination.[6] *Chapin v. Benwood Foundation, Inc., supra; Abercrombie v. Davies, supra; University Computing Company v. Lykes-Youngstown Corporation, supra.*[7] *Cf. Finklea v. Carolina Farms Company,* 196 S.C. 466, 13 S.E.2d 596 (1941).

The "best efforts" obligation required that United and its board of directors make a reasonable, diligent, and good faith effort to accomplish a given objective, *viz.,* security holder approval of the purchase agreement.

---

[4] The responsibilities of the board of directors within United's corporate structure are governed by Delaware law. *See* authorities collected at fn. 2.

[5] *See* fn. 2.

[6] *Cf.* Del. Code Ann. tit. 8, § 271(b), which authorizes a corporation's board of directors to abandon a proposed sale of all or substantially all of the corporation's assets after security holder approval for the sale has been secured. The abandonment authorized by § 271(b) is presumably predicated on a change in the directors' prior determination that the sale is "for the best interests of the corporation."

[7] There is no indication that United's certificate of incorporation contains any provision inconsistent with this conclusion. *See* Del. Code Ann. tit. 8, § 141(a) (Supp. 1977).

The obligation, however, must be viewed in the context of unanticipated events and the exigencies of continuing business development and cannot be construed to require that such events and exigencies be ignored or overcome at all costs. In short, the "best efforts" obligation was tempered by the directors' overriding duties under §§ 141(a) and 271(a) of the "General Corporation Law of the State of Delaware."

We therefore hold that the "best efforts" clause did not bind United's board of directors to recommend security holder approval of the purchase agreement when, subsequent to the execution of the agreement and the directors' initial determination under § 271(a), the directors inquired into changed circumstances and determined, pursuant to the exercise of their independent good faith judgment, that the terms of the purchase agreement were no longer in the security holders' best interests.

We affirm the determination of the court of appeals to the effect that the trial court should have directed a verdict in United's favor on the Co-op's counterclaim.

Judgment affirmed.

JUSTICE LEE and JUSTICE DUBOFSKY do not participate.