**R–G DENVER, LTD.,
Plaintiff-Appellant,**

v.

**FIRST CITY HOLDINGS OF COLORADO, INC., Robert H. Goodman, Mortab, Ltd., and First City Financial Corporation, Ltd., Defendants-Appellees.**

No. 84–1430.

United States Court of Appeals, Tenth Circuit.

May 2, 1986.

Miles C. Cortez, Jr., and Dean G. Panos, of Miles C. Cortez & Associates, P.C., Englewood, Colo., for plaintiff-appellant.

Tucker K. Trautman and Margaret L. Toal-Rossi, of Ireland, Stapleton, Pryor & Pascoe, P.C., Denver, Colo., for defendants-appellees.

Before BARRETT and ANDERSON, Circuit Judges, and COOK, District Judge.*

H. DALE COOK, District Judge.

This matter comes before this Court on appeal from a final order and judgment entered by the United States District Court for the District of Colorado, granting summary judgment in favor of the defendants below.[1] The effect of this ruling was to dismiss the claims of R–G Denver, Ltd. (R–G) as against First City Holdings of Colorado, Inc., Robert N. Goodman, Mortab, Ltd., and First City Financial Corporation, Ltd. (collectively referred to as "Holdings" for purposes of this appeal) for tor-

---

* Honorable H. Dale Cook, Chief Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

1. The order and judgment also dismissed the defendants' counterclaim, but that ruling has not been appealed.

tious interference with contractual and business relationships, tortious interference with prospective business and economic advantage, tortious interference with contractual rights with a third person, and for exemplary damages.

 In reviewing the district court's grant of summary judgment, we must view the case in the same manner as did that court. *Gomez v. American Electric Power Service Corp.*, 726 F.2d 649, 651 (10th Cir.1984). Thus, we must determine whether any genuine issue of material fact exists and, if not, whether the substantive law was correctly applied. *See* Fed.R. Civ.P. 56(c); *Western Casualty & Surety Co. v. Nat'l Union Fire Ins. Co.*, 677 F.2d 789 (10th Cir.1982). In doing so, we must view the record in the light most favorable to the party opposing the motion. *Lindley v. Amoco Production Co.*, 639 F.2d 671, 672 (10th Cir.1981). Conclusory allegations, however, do not establish an issue of fact under Rule 56. *Bruce v. Martin-Marietta Corp.*, 544 F.2d 442 (10th Cir.1976).

Based on our review of the record before us, as well as the briefs, written and oral arguments of counsel for the parties, and the applicable law, we find trial court's granting of summary judgment to have been proper. We affirm.

The basic facts are not disputed. R–G's claims arise out of a series of transactions and communications between it, Holdings, and the Denver Real Estate Investment Association (DREIA). These transactions and communications comprised competing efforts to purchase the assets or stock of DREIA.

Appellant R–G is an Illinois limited partnership formed to acquire the assets of DREIA, a business trust organized under Colorado law. Its noncash assets included interests in real and personal property located in several Colorado metropolitan areas. DREIA's business affairs were conducted by its Board of Trustees. The appellees, Holdings, are corporations and an individual who, together, own almost six percent of DREIA's stock.

R–G and DREIA entered into a contract on July 17, 1980, providing for R–G's purchase of all DREIA's assets for a purchase price of $42,540,000.00 and the unpaid principal balance on the closing date of certain outstanding promissory notes. The contract provided that two million dollars of the purchase price would be held in escrow for post-closing distribution to shareholders, contingent upon the satisfaction of certain conditions. This transaction represented a value of $32.00 per share, with a possible additional $2.00 per share to be distributed when the conditions were satisfied.

The R–G/DREIA agreement expressly provides, in pertinent part, as follows:

7. *Condition.*

(a) This Agreement and the Closing are expressly subject to and conditioned upon approval not later than October 15, 1980 of the transactions contemplated herein by the affirmative vote of the holders of a majority of the outstanding Shares of DREIA at a meeting of the Shareholders called for such purpose. In connection with obtaining said Shareholder approval, DREIA:

(i) shall seek and pursue with diligence favorable tax rulings from the Internal Revenue Service ...;

(ii) shall take all requisite action to expeditiously call a meeting of the Shareholders following the issuance of favorable Rulings and submit to the Shareholders resolutions approving and authorizing the execution, delivery and performance of the Agreement and all documents and instruments to be executed pursuant thereto (the "Resolutions");

(iii) shall consult with Purchaser and its counsel in preparing all necessary proxies, proxy statements and other materials, including but not limited to, all amendments and supplements thereto as may be necessary to make any statement in such proxies, proxy statements or other materials, at the time and in light of the circumstances under which it is made, not false or misleading with respect to any materi-

al fact, or to state any material fact necessary or necessary to correct any statement therein which has become false or misleading, with respect to the Resolutions;

(iv) shall distribute to the Shareholders all necessary proxies, proxy statements and other materials with respect to the Resolutions and solicit all such proxies from the Shareholders;

. . . .

(b) In the event that such requisite shareholder approval is not obtained by October 15, 1980, either Seller or Purchaser may terminate this Agreement by delivery of written notice thereof to the other party and in the absence of such notice this Agreement shall automatically terminate on December 31, 1980. In the event of any such termination not resulting from any breach by Purchaser of its obligations hereunder, the Earnest Money shall be immediately returned to Purchaser, Seller shall pay to Purchaser an amount equal to $200,000.00 plus the amount of any loan fees or commissions (not in excess of $100,000.00) paid by Purchaser to Continental Illinois National Bank and Trust Company of Chicago ("Continental Bank") and not refunded to Purchaser, as liquidated damages for Purchaser's costs and expenses incurred in connection with this transaction and as Purchaser's sole and exclusive remedy therefor (Seller and Purchaser hereby confirming that as of the date hereof they are unable to ascertain the amount of actual damages which Purchaser will incur if this Agreement is terminated as aforesaid), and neither Seller nor Purchaser shall have any further rights or obligations under this Agreement. In addition to the foregoing, in the event said shareholder approval is not obtained, Seller shall not, at any time prior to January 1, 1981, enter into any

letter of intent, agreement in principle or other contract or agreement with any third party to sell all or substantially all of the assets of DREIA, unless Seller first notifies Purchaser thereof and grants to Purchaser the right to purchase such assets on the same financial terms and conditions as are contained in such proposed third-party agreement and Purchaser fails to exercise such right by delivery of written notice thereof to Seller within fifteen (15) days following Purchaser's receipt of Seller's notice. . . .

On or about August 12, 1980, Holdings filed a Form Schedule 13D with the Securities Exchange Commission, which stated that Holdings had recently acquired over five percent of DREIA's common stock, making Holdings the single largest DREIA shareholder. In this filing, Holdings indicated that it might wish to obtain control of DREIA or its assets.

Holdings, with knowledge of the R–G/DREIA contract and of a contract R–G had with Prudential[2], informed DREIA on or about September 15, 1980, that it intended to make a tender offer for DREIA's stock for $35.00 per share. The next day DREIA issued a press release reporting Holding's intended tender offer and issued a Notice of Special Meeting of Shareholders to its shareholders, referencing the scheduled October 15, 1980 meeting, recommending the R–G/DREIA contract, and including an agenda on which the R–G/DREIA proposal would be voted upon.[3]

On September 18, 1980, Holdings told DREIA it would not make a tender offer, but was continuing to consider available courses of action. A press release was issued, reflecting this changed circumstance.

On October 3, 1980, Holdings offered to buy DREIA's assets for $36.00 per share, with no escrow hold-back and with all other

2. By the terms of a contract between R–G and Prudential Insurance Company of America, also dated July 17, 1980, R–G was to sell Prudential some of the assets it was to acquire under the R–G/DREIA agreement, simultaneously with that agreement.

3. The favorable tax rulings, contemplated by the agreement, had been received from the IRS.

terms essentially identical to those proffered by R–G. The offer's expiration date was October 9, 1980. An October 6th press release informed DREIA shareholders of this new proposal, which DREIA rejected because it did not accommodate the right of first refusal granted R–G under the July 17, 1980 agreement with DREIA.

On or about October 8, 1980, Holdings extended a new offer for the DREIA assets at the same price of $36.00 per share. This offer, accommodating R–G's right of first refusal, was to expire on October 13, 1980. Holdings submitted for DREIA's approval a $5,000,000.00 letter of credit payable to DREIA, to be deposited in escrow upon DREIA's acceptance of Holdings' offer.

The offer was extended by Holdings beyond the October 13 deadline when DREIA's trustees did not accept it by that date. The extended offer contained a provision for revocability at any time prior to acceptance.

DREIA had been soliciting proxies in favor of the R–G acquisition to be voted at the October 15, 1980 shareholders' meeting since September 16. The trustees concluded, however, in view of the material developments regarding Holdings, that the proxies solicited were no longer complete. The October 15 meeting therefore resulted in adjournment to a later date without a vote on the R–G/DREIA contract so that proper, updated proxies might be solicited.

Holdings revoked its asset offer on November 13, 1980, and made a tender offer to DREIA at $36.00 per share, which was amended to $37.15 per share on December 8, 1980. Proxies were again sent out. On December 15, 1980, the trustees of DREIA announced a recommendation in support of Holdings' offer.

At a price of $37.15 per share, Holdings acquired 79.8% of the outstanding shares of DREIA. At the continuation of the shareholders' meeting held on January 6, 1981, Holdings abstained from voting on the approval of the R–G acquisition. As a result, the R–G plan failed to obtain approval. On that same date, DREIA, controlled by Holdings, paid R–G the sum of $200,000.00 as a full and complete mutual release of any liability.

## I

### R–G's Assertions of Error as to First Cause of Action:

### Tortious Interference With a Contract

The first of R–G's assertions of error raised on appeal regarding the sustained summary judgment concerns the district court's finding, as to R–G's claim for tortious interference with a contract, that R–G could not, as a matter of law, prevail because it could not prove that the adjournment of the October 15, 1980 meeting constituted a breach of the unambiguous R–G/DREIA agreement. Trial court relied on Colorado law recognizing no breach of an agreement where a contractual duty becomes inconsistent with fiduciary duties. *Great Western Producers Co-operative v. Great Western United Corporation*, 200 Colo. 180, 613 P.2d 873 (1980).

R–G disagrees with these findings, contending first that the contract is at least ambiguous as to the provision for the October 15th meeting; second, that the district court's finding of no breach was erroneous; and, third, that the trial judge ignored the controverted factual issue of whether Holdings wrongfully manipulated the fiduciary duties of the DREIA trustees. In this regard, R–G contends that a fact-finder could reasonably infer that Holdings' offers were made in bad faith and with the sole purpose of manipulating the DREIA trustees' fiduciary duties to prevent the shareholder vote on the R–G/DREIA proposal.

Whether a written document is ambiguous is a question of law. *Local 9, Internat'l Union of Operating Eng. v. Siegrist Constr. Co.*, 458 F.2d 1313 (10th Cir.1972). A difference of opinion between the parties about the interpretation to be given does not create ambiguity. *Radiology Professional Corp. v. Trinidad Area Health Ass'n, Inc.*, 195 Colo. 253, 577 P.2d 748 (1978). Construction of an unambiguous contract is also a matter for the court. *Resort Car Rental System, Inc. v. Chuck*

*Ruwart Chevrolet, Inc.,* 519 F.2d 317 (10th Cir.1975).

■ In dismissing this claim, trial court correctly recognized the unambiguity of the agreement, particularly as to the intended effect of the October 15th meeting date. The agreement provided that it "and the closing are expressly subject to and conditioned upon approval not later than October 15, 1980 of the transactions contemplated herein by the affirmative vote of the [shareholders]." It further provided for either party to terminate the agreement "in the event that such requisite shareholder approval is not obtained by October 15, 1980." If such was not terminated, the agreement provided for an automatic December 31, 1980 termination. In addition, the agreement was not exclusive and by its terms contemplated competing offers. R–G had the right of first refusal if the DREIA shareholders did not approve the sale to R–G.

The cited language of the agreement clearly does not encompass an absolute duty to hold a shareholder vote on October 15, 1980, regardless of intervening events. The language instead sets forth shareholder approval as a condition, just as the contract provided for other conditions such as securing favorable IRS tax rulings.[4]

We note the five elements necessary for plaintiff to prove to establish its claim of tortious interference with a contract: (1) an existing valid contract between plaintiff and a third party; (2) knowledge by the defendant of this contract, or knowledge of facts which should lead him to inquire as to the existence of same; (3) intent by the defendant to induce a breach of contract by the third party; (4) action by defendant which induces a breach of the contract; and (5) damage to the plaintiff. *Comtrol, Inc. v. Mountain States Telephone and Telegraph Co.,* 32 Colo.App. 384, 513 P.2d 1082 (1973). It is clear this action cannot survive the absence of one of these elements, and we find the record cannot and does not support a finding of a breach as a matter of law.

The only alleged induced breach before us is the failure to hold a shareholder vote on October 15, 1980. The shareholder approval was an event expressly provided for in the agreement as a condition to be satisfied before the legal rights and duties of R–G and DREIA to buy and to sell would arise. Non-occurrence of such a condition involves no rights or duties, unlike nonfulfillment of a promise, which would create a right to damages for failure to perform a legal duty.

Moreover, R–G admitted the R–G/DREIA agreement had not been breached in its letter to DREIA dated November 19, 1980, some four weeks after the October 15 deadline. The letter clearly stated that R–G knew of no fact nor had reason to know of any fact constituting a failure to perform by DREIA and that R–G had no rights, claims or causes of action against DREIA.

Our decision is also dictated by case law of Colorado. In *Great Western Producers Co-operative v. Great Western United Corporation,* 200 Colo. 180, 613 P.2d 873 (1980), the Supreme Court of Colorado, facing similar facts, upheld the holding of the court of appeals that trial court should have granted a directed verdict on a buyer's counterclaim for breach of contract where the defendant's board of directors had entered into an agreement to sell the stock of its wholly-owned subsidiary to the plaintiff buyer, conditioned on shareholder approval. The defendant's board was specifically required by the agreement to use its "best efforts" to obtain shareholder approval. The proxy statement distributed to the shareholders stated that the board believed the consideration provided for in the purchase agreement was fair. Before shareholder ratification, however, the price of sugar increased, and the board consequently determined that a higher projection for the sugar-producing subsidiary was

---

**4.** R–G concedes the October 15 shareholder vote is an express condition. (Pg. 11, Reply Brief of

September 21, 1984.)

needed. Shortly before the termination date of its agreement with plaintiff, it recommended that shareholders disapprove plaintiff's agreement. Plaintiff claimed this action was a breach of defendant's contractual duty to use "best efforts" to obtain shareholder approval.

The Supreme Court of Colorado, affirming the lower appellate court, argued that defendant had committed no breach of the agreement because the "best efforts" clause had to be consistent with the fiduciary duty of defendant's board of directors to exercise independent judgment and inform shareholders of any changed circumstances which would affect the desirability of the contract.[5] The obligation of "best efforts" is to be viewed "in the context of unanticipated events and the exigencies of continuing business development." *Great Western, supra* 613 P.2d at 878.

In the case before us, the DREIA trustees were governed by fiduciary duties at least as demanding as those of corporate directors.[6] They had entered into an agreement with R–G, just as the *Great Western* board of directors had, which was likewise conditioned upon shareholder approval. And, like the board in *Great Western*, the DREIA board changed its recommendation of approval prior to the shareholder vote.

The DREIA board had a fiduciary duty to inform its shareholders that a competing offer had been made which would distribute, if accepted, at least an additional 2.2 million dollars, and up to a possible 4.4 million dollars, to those shareholders. It also had a duty to make recommendations in light of the new, higher offer, and to not permit a vote to be taken on October 15 when the proxies collected had been solicited upon the trustees' recommendation based on a situation which had substantially changed since the time the proxies had been mailed.

Neither could the DREIA trustees violate federal securities laws. Title 17 C.F.R. § 240.14a–9 provides that "no solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." *See* Title 15 U.S.C. § 78n(e) (Securities Exchange Act of 1934).

R–G's final argument that its cause of action for tortious interference with a contract should survive the summary judgment is that a fact-finder could reasonably infer from the undisputed facts that Holdings' offers were made in bad faith and with the sole purpose of manipulating the fiduciary duties so that the shareholder vote would *have* to be prevented. In absence of a breach, as we have held, the question of Holdings' motives and intent as to this cause of action are moot.

II

*R–G's Second Cause of Action:*

*Tortious Interference with Prospective Business and Economic Advantage*

The second of R–G's assertions of error raised on appeal regarding the sustained summary judgment concerns the district court's finding, as to R–G's claim of tor-

---

**5.** *Great Western, supra,* involved application of Delaware law governing directors' fiduciary duties. The DREIA trustees were governed by Colorado law, which imposes similar obligations. See C.R.S. §§ 7–5–101(2), 15–1–304, 15–1–103(2) and compare Del.Code Ann. tit. 8, §§ 271(a), (b) as cited by the Supreme Court of Colorado in *Great Western.*

**6.** *Compare* C.R.S. § 7–5–101(2) (a director must perform duties in good faith, in a manner he

reasonably believes to be in the best interests of the corporation, and with such care as an ordinarily prudent person would use in a like position under similar circumstances) *with* C.R.S. § 15–1–304 (fiduciaries, defined to include trustees in § 15–1–103(2), shall exercise the judgment and care, under circumstances then prevailing, which men of prudence, discretion, and intelligence exercise in the management of the property of another).

tious interference with prospective business and economic advantage, that R–G could not prevail on this theory for the reason that Holdings' actions were privileged as proper competition as a matter of law and as a proper pursuit of a business purpose of protecting a financial interest.

R–G disagrees with trial court's conclusions, and counters with the assertion that whether or not the actions and methods of Holdings were improper or privileged is a disputed factual issue that precludes summary judgment. R–G argues that a reasonable person could infer that Holdings' actions prior to the October 15th meeting date were bad faith "now you see it—now you don't" last minute asset and tender offers made with no intention that DREIA accept such offers, but made only with the intent to prevent the October 15 shareholder vote. Any privilege to compete which Holdings may have had, R–G continues, was lost by improper and wrongful means and actions.

Although trial court expressed its wariness in granting summary judgment where conflicting inferences of intent and motive are argued before it, it concluded that no reasonable person could infer and conclude that the conduct of Holdings was in any way "wrongful" as that term is understood and developed in Section 768(1) of the Restatement (Second) of Torts.

Colorado does recognize the tort of interference with a prospective business advantage as actionable. *Dolton v. Capitol Federal Savings and Loan Association,* 642 P.2d 21 (Colo.App.1981). Colorado courts have also adopted Section 768(1) of the Restatement (Second) of Torts as the law regarding a competitor's privilege as to prospective business or contractual relations.

Section 768(1) provides, in pertinent part:

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor ... does not interfere improperly with the other's relation if (a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

■ Assuming, *arguendo,* plaintiff had a protectable prospective contractual relation, factor (a) above is clearly present and undisputed. Factor (b) refers to "wrongful means". As contemplated in the Restatement (Second), this term includes physical violence, fraud, civil suits, and criminal prosecutions, none of which are present here. In addition, Comment e on Clause (b) provides in pertinent part:

The rule stated in this Section rests on the belief that competition is a necessary or desirable incident of free enterprise.... If the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purposes for which competition is encouraged.

Factor (c) speaks to the creation or continuation of an unlawful restraint of trade. No such allegation is before us, leaving factor (d) for our consideration. It is clear from the undisputed facts before us that Holdings' purpose, in large part, was to advance its interest in competing with R–G.

Comment (g) on Clause (d) states in pertinent part:

The rule stated in this Section developed to advance the actor's competitive interest and the supposed social benefits arising from it. If his conduct is directed, at least in part, to that end, the fact that he is also motivated by other impulses, as, for example, hatred or a desire for revenge is not alone sufficient to make his interference improper.

The facts are clear that one of Holdings' apparent motives and intentions was to acquire DREIA assets or stock, a purpose consistent with competition and one which Holdings pursued and accomplished. Further, no reasonable person could infer any wrongful means, bad faith, or noncompeti-

tive motives from Holdings' actions based on the undisputed facts before us. There is no evidence before us that either establishes or even infers Holdings had no intention to perform in October. The October asset offer was extended five days. Two months later, Holdings paid millions of dollars for DREIA. The offers were consistent with Holdings' business position of being the largest DREIA shareholder, and DREIA indicated it considered the offers to be serious by resoliciting proxies.

And, in summation, neither could a reasonable person find from the facts that the *sole* purpose of Holdings' actions was some wrongful, bad faith, or improper one. As such, trial court properly granted summary judgment as against plaintiff on this second cause of action.

### III

### *R–G's Third and Fourth Theories of Recovery:*

### *Contractual Rights with Prudential and Exemplary Damages*

The parties to this appeal expressly agree that the failure of R–G's first two claims to withstand affirmance of the summary judgment results in the failure of these last two claims as well. We agree. The contract R–G had with Prudential was entirely contingent on R–G's successful purchase of DREIA, and thus no logical basis exists for arguing that Holdings interfered with that contract in light of our findings and decision herein. Likewise, without a finding of actual damages, a claim for exemplary damages must also fail. *Wagner v. Dan Unfug Motors, Inc.,* 35 Colo.App. 102, 529 P.2d 656 (1974).

### IV

### *Conclusion*

For the reasons expressed in the foregoing opinion, we find no error in the district court's judgment in favor of Holdings, and that judgment is hereby in all respects affirmed.