COLORADO NATIONAL BANK OF DENVER, Individually, and as Personal Representative of the Estate of William Henry Conter, a/k/a William H. Conter, a/k/a William Conter, Deceased, Petitioner/Cross–Respondent,

v.

Don FRIEDMAN, Individually, and as General Partner of Wikiup Mobile Home Club, a Colorado limited partnership, Respondent/Cross–Petitioner.

No. 91SC706.

Supreme Court of Colorado,
En Banc.

Feb. 8, 1993.

Rehearing Denied March 15, 1993.

Davis, Graham & Stubbs, John M. Roche, Richard P. Holme, Denver, for petitioner/cross-respondent Colorado Nat. Bank of Denver, in its Individual Capacity.

John S. Pfeiffer, Denver, for petitioner/cross-respondent Colorado Nat. Bank of Denver, as Personal Representative.

Krendl Horowitz & Krendl, P.C., Jay S. Horowitz, Kim E. Ikeler, Denver, for respondent/cross-petitioner.

Justice VOLLACK delivered the Opinion of the Court.

Petitioner Colorado National Bank (the Bank) and cross-petitioner Don Friedman (Friedman) petition from the court of appeals opinion in *Friedman v. Colorado National Bank of Denver*, 825 P.2d 1033 (Colo.App.1991). The court of appeals found, among other things, that the Bank breached a contract with Friedman in bad faith, but that Friedman was not permitted to recover damages for lost profits as a result of the breach. The court of appeals also determined that the successor judge appropriately performed post-trial duties. The court of appeals concluded that the district court erred by dismissing Friedman's claim for tortious interference with contract. We affirm the court of appeals opinion in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

On December 2, 1964, William Conter (Conter) and Don Friedman (Friedman) executed an agreement wherein they formed a limited partnership. On February 14, 1978, Friedman and Conter amended their limited partnership agreement. The amended agreement (the 1978 Agreement) stated that it replaced the original partnership agreement in its entirety. The 1978 Agreement provided that the purposes of the partnership were to develop, construct, and operate a mobile home resort, and that the name of the resort continued to be the "Wikiup Mobile Home Club" (the mobile home club).

The 1978 Agreement stated that Friedman was the sole general partner, while both Friedman and Conter were limited partners. The profits and losses of the partnership were allocated as follows:

Friedman — as General Partner: 05%
Friedman — as Limited Partner: 45%
Conter — as Limited Partner: 50%

The 1978 Agreement stated that the general partner shall be "the sole and exclusive manager" of the mobile home club, and "shall be responsible for all management,

policy, and general management supervision without fee except as otherwise agreed on by the parties."

The 1978 Agreement expressly stated that the partnership would not terminate upon the death of a limited partner. Rather, the limited partner's personal representative, heirs, or devisees shall succeed to the deceased limited partner's interest. The 1978 Agreement provided that it would be binding upon the limited partner's personal representatives.

The 1978 Agreement expressly included the following provisions:[1]

### XIII. OPTION TO PURCHASE

A. Notwithstanding anything else in Article XI or elsewhere in this Agreement, the following events shall give the General Partner an option to purchase the interest of a Limited Partner:

1. In the event of the death of a Limited Partner, the General Partner shall have the right to purchase the entire interest of such Limited Partner;
....

B. Whenever the General Partner has an option to purchase the interest of a Limited Partner, the price to be paid and the terms of the option shall be as follows:

1. In the event of the death of a Limited Partner, the price to be paid shall be equal to the value of the decedent's partnership interest as of his date of death as submitted for federal estate tax purposes. Payment shall be made in four equal semiannual installments, including interest, beginning four months after election to purchase, and any balance shall bear interest at 7% per annum.... Election to purchase the decedent's interest by a surviving General Partner shall be made within 60 days after the delivery to the surviving Partner of an appraisal, accompanied by a letter stating that the appraisal will be (or has been) used in the decedent's federal estate tax return.... The purchase price shall not be adjusted if the value of the partnership interest is redetermined upon audit of the return. If no federal tax return is filed, the Personal Representative of the decedent and the surviving General Partner shall agree as to the value as of the date of death.... The surviving General Partner shall have 60 days after the delivery to him of such an appraisal to elect to purchase the decedent's interest.... If election is made, then the purchasing Partner shall become the sole owner of the partnership interest and the deceased Partner's estate shall have no further interest in the business....

In 1981, Conter established a revocable trust, into which he deposited his interest in the limited partnership. Conter named the Bank trustee, and the Bank subsequently began administering the trust.

In 1985, Friedman contacted the Bank, and proposed establishing a management company for the mobile home club. Friedman indicated that quick action was required in order to prevent high vacancy rates in the succeeding year. The Bank neither accepted nor rejected Friedman's proposal. The Bank, however, contacted an attorney, and sought an interpretation of the 1978 Agreement in the event of Conter's death.[2] On January 11, 1986, Conter died.

On March 10, 1986, Friedman filed a claim asserting his rights to purchase Conter's interest in the mobile home club, pur-

---

1. The amendments were recorded on March 15, 1978, in Adams County, the county in which the mobile home club was located.

2. On November 22, 1985, the Bank directed a list of questions to an attorney. The attorney stated in response:
   One question which concerned me ... was what would happen if Mr. Conter died.... As I have discussed with you in a previous letter dated November 6, 1985, the buy-out provision in the Partnership Agreement which would be invoked in the event of Mr. Conter's death appears to give Mr. Friedman the right to purchase Mr. Conter's interest at an advantageous price. Clearly, it would be in the best interest of Mr. Conter's estate to avoid this provision, if possible.

suant to the 1978 Agreement.[3] In March of 1986, the Bank employed Wilson Wampler (Wampler) of Value Consultants, Inc., to appraise the value of Conter's interest in the mobile home club at the time of his death. The Bank also contacted J.S. Harper & Company, and discussed the possibility of obtaining a second appraisal. On April 25, 1986, the Bank filed a notice of disallowance. In that notice, the Bank identified itself as the personal representative of Conter's estate. On June 13, 1986, Wampler provided the Bank with an estimate, setting the value of the mobile home club at $5,635,000. On June 20, Friedman sought both a declaration that he held an option to purchase the estate's interest in the mobile home club, and a decree of specific performance requiring the Bank, as personal representative of Conter's estate, to execute section XIII of the 1978 Agreement.

On August 1, the Bank filed an answer and counterclaim. The Bank contended that Friedman's claims should be barred by the doctrine of unclean hands. The Bank counterclaimed that Friedman improperly charged the partnership for management fees, and thus breached the 1978 Agreement. The Bank requested the probate court to issue an order dissolving the partnership and awarding the estate damages. On November 20, the Bank filed an amended answer and counterclaim wherein the Bank asserted that neither Conter nor his personal representative had agreed to pay for management supervision.

On April 7, 1987, approximately ten months after the Bank received Wampler's appraisal, Harper delivered an appraisal to the Bank, estimating that the mobile club was worth $6,337,000 at the time of Conter's death.

On April 10, 1987, more than one year after Conter's death, the Bank agreed to honor Friedman's right to purchase Conter's interest. Relying on Harper's 1987 appraisal, the Bank informed Friedman that the value of Conter's interest in the mobile home club, for federal estate tax purposes, was set at $2,900,000. The Bank provided Friedman with copies of both Harper's 1987 appraisal and Wampler's 1986 appraisal.

Friedman subsequently informed the Bank that he wished to exercise his option to purchase Conter's interest for $2,900,-000. Friedman, however, reserved any claims he might have against the Bank regarding the amount of and method used to determine the value of the interest. Friedman additionally tendered the Bank a promissory note in the requested amount. The Bank, however, refused to execute the sale of Conter's interest on the ground that Friedman refused to waive his claims against the Bank.

On January 26, 1988, Friedman filed an amended petition for allowance of claim, and a demand for a jury trial. Friedman stated four causes of action against the Bank: (1) As the personal representative of Conter's estate, the Bank breached the 1978 Agreement; (2) the Bank should be enjoined to permit Friedman to purchase Conter's interest at a price of $1,900,000; (3) the Bank, in its individual capacity, tortiously interfered with the contract between Friedman and Conter's estate; and (4) the Bank and the estate breached an implied covenant of good faith and fair

3. The March 10, 1986, claim was filed in Probate Court, in and for the City and County of Denver. In a motion for leave to file an amended petition for allowance of claim, Friedman stated that he filed a separate civil action in Adams County District Court. On December 29, 1987, the Adams County District Court placed the matter in abeyance, pending proceedings in Denver Probate Court.

Friedman filed, on November 6, 1987, a complaint and demand for jury trial in the District Court in and for the City and County of Denver. Friedman contended that the District Court in and for the City and County of Denver was the most appropriate forum in which to litigate his claims, and, as a result, Friedman sought dismissal of the probate court actions commenced in both Adams County and the City and County of Denver.

On January 8, 1988, the district court in and for the City and County of Denver entered an order staying Friedman's action against the Bank, pending resolution of the probate court action.

On April 13, 1988, the judge of the probate court recused himself from Friedman's action, and referred the case to the district court in and for the City and County of Denver.

dealing under the 1978 Agreement. Friedman sought punitive damages in excess of $1,000,000 based on the Bank's breach of contract and tortious conduct.

In the amended petition, Friedman stated that the 1978 amendments to the Agreement were designed to both reflect recognition of and reward Friedman's considerable efforts expended on management of the mobile home club. Friedman also noted that he regularly distributed financial statements and Conter's share of profits to the Bank from 1981 until Conter's death in 1986. During this five-year interval, the Bank never expressed dissatisfaction with Friedman's management of the mobile home club. Friedman alleged that the improper conduct of both the Bank and the estate prevented him from selling the mobile home club.

On February 22, 1988, the Bank in turn filed an answer to Friedman's amended petition for allowance of a claim. The Bank claimed that it provided Friedman appraisals in full compliance with the 1978 Agreement. The Bank contended that Friedman first breached the 1978 Agreement: (1) by failing to distribute Conter's share of profits from the mobile home club; (2) by establishing a management company; and (3) by using partnership funds to pay attorney fees and personal expenses incurred as a result of litigation. The Bank sought an accounting, an injunction ordering Friedman to distribute profits, and an order dissolving the partnership.

On December 13, 1988, the district court entered an order on Friedman's motion for summary judgment and on the Bank's motions to dismiss and for summary judgment. The district court concluded that Friedman's allegations that the Bank breached the 1978 Agreement were sufficient to withstand a motion to dismiss.

The district court additionally concluded that Friedman's claim of tortious interference with contract against the Bank in its individual capacity could not stand. The district court stated that a claim for intentional interference with contractual obligations requires the existence of a contract between the plaintiff and a third party. The plaintiff must allege that a defendant induced the third party not to perform the contract, or that a defendant interfered with a third party's performance of the contract. In the present action, the district court determined that there was no third party. The district court ruled that "[t]he Bank is the personal representative of Conter's estate. Even [Friedman] agrees that a personal representative succeeds to the rights and obligations of the Estate's decedent, effectively 'stepping into the shoes' of the decedent."

The district court determined that Friedman stated a claim for breach of an implied covenant of good faith and fair dealing. Relying on section 355 of the *Restatement (Second) of Contracts* (1981), the district court noted that an implied covenant of good faith and fair dealing was included in the 1978 Agreement. The district court concluded, however, that a breach of this covenant did not support an award of punitive damages; accordingly, the district court dismissed Friedman's request for punitive damages. The district court additionally found that Friedman's claim for breach of the implied covenant must be dismissed because Friedman asserted the claim against the Bank in its individual capacity. The district court emphasized that the Bank may only have incurred liability in its representative capacity under the implied covenant.

With respect to the Bank's counterclaims, the district court concluded that there were issues of material fact regarding whether Friedman first breached the 1978 Agreement by using partnership funds to pay fees to his management company. The district court denied Friedman's motion for summary judgment.

The action proceeded to a jury trial on January 10, 1989.[4] At the conclusion of

---

**4.** The district court stated that, because the action was a suit for specific performance, the jury was advisory pursuant to C.R.C.P. 39(c). Although the district court noted that it was not bound by the jury's findings, the district court adopted many of the jury's findings in its findings of fact and conclusions of law.

the trial, the jury answered interrogatories, finding that the Bank's actions in establishing the value of Conter's interest involved either bad faith or failure to exercise an honest judgment. The jury determined that the Bank should have placed a value of $1,972,250 on Conter's interest in the mobile home club. The jury also determined that Friedman should have been permitted to purchase Conter's interest in the mobile home club on September 1, 1986. The jury found that Friedman would have sold the mobile home club in 1987 for $6,900,000. The jury found that Friedman did not receive compensation for his duties as General Partner in violation of the 1978 Agreement.

On January 26, 1989, the district court delivered findings of fact and conclusions of law.[5] The district court noted that the Bank was acting as trustee for Conter's trust in 1985. Friedman approached the Bank in 1985 to discuss a management proposal. The district court determined that, in 1985, the Bank anticipated Conter's death, and sought counsel from its attorneys regarding both Friedman's management proposals and the Bank's obligations under the 1978 Agreement. The district court found that the Bank characterized the mobile home club as a "money machine" or "cash cow," and that the Bank expressed concern that Friedman would be able to purchase Conter's interest at a potentially low value. The district court determined that "[i]t is clear throughout that the Bank did not want the estate to lose the 'cash cow.'"

The district court stated that, after Conter's death, the Bank retained Wampler to appraise Conter's interest in the normal course of its business. The Bank also contemplated retaining J.S. Harper & Company to provide an on-going appraisal of the asset. According to the district court's findings, the Bank received Wampler's appraisal on June 13, 1986, estimating that, at

the time of Conter's death, the mobile home club was worth $5,635,000.

The district court found that the Bank contacted Harper in early 1986, but did not retain Harper until 1987. Harper estimated that the mobile home club was worth $6,337,000. Harper initially suggested that the $6,337,000 estimate be discounted by twenty percent. The Bank, however, asked Harper to remove the discount, and Harper complied. The district court determined that this was not in the Bank's normal course of business with respect to valuing mobile home parks. The district court ultimately adopted the jury's finding that the Bank's actions in establishing an option price for Conter's interest "involve[d] either dishonest action taken in knowing and reckless disregard of the rights of another or the failure to exercise an honest judgment." The district court ruled:

> The Bank engaged in a course of conduct which demonstrates that they were knowingly, and I have to find recklessly, disregarding the rights of Mr. Friedman. The fact that they had a fiduciary duty to maintain and maximize if possible the assets of the estate, and I don't know if the latter's exactly true, does not mean that they can create an asset in the estate which does not exist. The beneficiaries may not have liked it, but all they owned was a *limited* partnership interest which was encumbered by Mr. Friedman's option to purchase at a price which was to be determined under a particular formula.
>
> ... [L]et's assume for the moment that the bank was overzealous in acting on behalf of the beneficiaries. They were really trying to do the maximum for them. They may have had the best intentions in the world in some respects. That does not justify the actions when it constitutes a breach of contract which has been found to be in bad faith.

The district court adopted the jury's findings that Conter's interest was valued at $1,972,250 at the time of his death,[6] and

---

5. The district court indicated that its findings would not be final until it prepared a signed, written order.

6. The district court relied on a method used both by Friedman's expert and by Wampler in arriving at the value of $1,972,250. That method entails ascertaining the value for estate tax

that Friedman should have been able to purchase that interest on September 1, 1986. The district court conversely concluded that Harper's appraisal "[did] not appear to be a totally independent appraisal," and that the method employed by Harper to achieve his value was inappropriate for the type of asset involved.

The district court found that any actions taken by Friedman with respect to creating a management company were actions taken to protect the mobile home club. To the extent that Friedman's actions may have constituted a breach of the 1978 Agreement, the district court concluded that any breach would neither be substantial or material. The district court also concluded that the Bank consented to Friedman's actions.

On November 30, 1989, the district court entered a final judgment, titled "Findings of Fact and Conclusions of Law," containing findings and conclusions substantially similar to those given on January 26, at the conclusion of trial. In the November findings of fact, the district court concluded that Friedman was entitled to exercise his option to purchase Conter's interest in the mobile home club for the total purchase price of $1,977,441. The district court also ruled that Friedman should recover fees and costs incurred in litigation. The district court additionally concluded that Friedman failed to prove that he was entitled to lost profits based on his inability to sell the mobile home club. The district court specifically found that Friedman did not prove that he could have sold the mobile home club for $6,900,000 in 1987. The district court made detailed findings regarding the total purchase price and payment schedule to be followed.[7]

The district court directed that any post-trial motions could be filed within the succeeding twenty-five days pursuant to C.R.C.P. 59(a). The district court judge indicated that she would be resigning her office at the close of business on November 30, 1989, and that any post-trial motions would be decided by a successor judge.

Both parties filed post-trial motions. On December 26, 1989, Friedman filed a motion to implement the district court's judgment of specific performance. On the same date, the Bank filed a motion for new trial or for judgment notwithstanding the verdict. The Bank contended, among other things, that a new trial was necessary because a successor judge would lack authority to perform the duties necessary to conclude the case. The Bank also contended that the presiding district court judge did not file findings of fact and conclusions of law in compliance with the Colorado Rules of Civil Procedure before she retired.

On January 19, 1990, a successor judge entered an order regarding post-trial motions. The successor judge denied the Bank's motion for a new trial and for judgment notwithstanding the verdict. The successor judge, however, ruled that the district court's award of attorney fees to Friedman could not stand. On February 6, 1990, the successor judge entered an order directing the parties to execute a promissory note, indenture, and assignment.

The Bank appealed, and Friedman cross-appealed. The Bank contended that, among other things, the district court did not give full consideration to the bank's fiduciary duty to the heirs of the estate when determining that the bank acted in bad faith. The Bank also argued that the successor judge did not have jurisdiction to enter a judgment because the district court judge resigned her office before entering a final judgment. Friedman argued that the trial court erred by dismissing his claims for tortious interference with contractual obligations and his claim for punitive damages against the Bank.

The court of appeals first determined that it had jurisdiction to preside over the appeal because the successor judge had jurisdiction to rule on the post-trial motions. *Friedman v. Colorado Nat'l Bank of Denver*, 825 P.2d 1033, 1036–38 (Colo. App.1991). The court of appeals reasoned that a successor judge may perform post-

---

purposes and subsequently applying a discount to the value. *See* part IV.

7. *See infra* part II, nn. 10 & 11.

trial duties "[i]f a judge, after sitting on a case and adopting findings of fact and conclusions of law, is, for any reason, unable to perform his or her duties." *Id.* at 1036.

With respect to the Bank's contentions, the court of appeals found that the Bank's efforts to obtain a second appraisal of the mobile home club "were tinged with dishonesty, bad faith, or the failure to exercise an honest judgment." *Id.* at 1040. The court of appeals also found that no fiduciary duty justifies a violation of the implied covenant of good faith and fair dealing implied in every contract under Colorado law. *Id.* The court of appeals affirmed the district court's determination regarding the Bank's bad faith breach of contract. *Id.* The court of appeals reversed the district court's dismissal of Friedman's tortious interference with contractual obligations on the ground that the Bank assumed no personal liability to perform Conter's obligations under the 1978 Agreement. *Id.* However, the court of appeals upheld the trial court's dismissal of Friedman's punitive damages claim.

The Bank filed a petition for a writ of certiorari in this court, and Friedman filed a cross-petition. We granted certiorari to evaluate the claims presented in the petition and cross-petition. We individually address each contention.

## II.

The Bank contends that the court of appeals erred by concluding that a successor judge had authority to perform functions other than granting a new trial, pursuant to C.R.C.P. 63. We disagree.

## A.

■ Titled "Disability of a Judge," C.R.C.P. 63 provides:

If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a verdict is returned or findings of fact and conclusions of law are filed, then any other judge sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial.

The rule expressly states that successor judges have discretion to rule on motions for new trial. *See Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, 576 F.Supp. 107, 125 (D.Del.1983) (holding that, under F.R.C.P. 63, successor judges have discretion to grant new trials if they feel it is necessary in light of the entire record), *aff'd*, 740 F.2d 958 (3rd Cir.1984); [8] *Faris v. Rothenberg*, 648 P.2d 1089, 1092 (Colo. 1982) (concluding that a successor judge has discretion to rule on a motion for new trial which challenges the sufficiency of the evidence). C.R.C.P. 63 only permits successor judges to exercise discretion, however, after findings of fact and conclusions of law have been entered by the trial court.

■ In examining a court's exercise of discretion, we have stated that "[t]o say that a court has discretion in resolving [an] issue means that it has the power to choose between two or more courses of action and is therefore not bound in all cases to select one over the other." *People v. Crow*, 789 P.2d 1104, 1106 (Colo.1990) (quoting *People v. Milton*, 732 P.2d 1199, 1207 (Colo.1987)); *see Southeastern Colo. Water Conservancy Dist. v. O'Neill*, 817 P.2d 500, 506 (Colo. 1991); *Aspen Skiing Co. v. Peer*, 804 P.2d 166, 172 (Colo.1991); *Buckmiller v. Safeway Stores, Inc.*, 727 P.2d 1112, 1115 (Colo. 1986). Thus, under C.R.C.P. 63, the successor judge is required to determine whether ruling on post-trial motions, or ordering a new trial, is the most prudent course of action.

■ "[A] ruling by the trial court in an area where it has discretionary power will not be disturbed on review, unless it [is] clearly shown that there was an abuse of

---

**8.** We have previously held that federal cases interpreting F.R.C.P. 63 are highly persuasive, as F.R.C.P. 63 is identical to C.R.C.P. 63. *Faris v. Rothenberg*, 648 P.2d 1089, 1091 n. 1 (Colo. 1982).

such discretionary power." *Moseley v. Lamirato*, 149 Colo. 440, 447, 370 P.2d 450, 455 (1962); *see Smith v. Smith*, 172 Colo. 516, 474 P.2d 619, 621 (1970) (holding that whenever this court is called on to review a matter within the sound discretion of a trial judge, we will not reverse that finding unless it constitutes a clear abuse of that discretion); *see also Aspen Skiing Co.*, 804 P.2d at 172 (holding that a trial court is vested with considerable discretion in ruling on motions for new trials, and such ruling will not be disturbed in the absence of a clear showing of abuse); *People v. Crow*, 789 P.2d at 1106 (holding that trial courts have discretion to rule on motions to continue, and such rulings will not be disturbed on appeal in the absence of a clear showing of abuse).

We have opined that a trial court's actions amount to an abuse of discretion when the actions are "manifestly arbitrary, unreasonable, or unfair." *Nagy v. District Court*, 762 P.2d 158, 161 (Colo.1988) (quoting *People v. Milton*, 732 P.2d 1199, 1207 (Colo.1987)) (involving a civil action for payment on a promissory note); *Burt v. Beautiful Savior Lutheran Church of Broomfield*, 809 P.2d 1064, 1069 (Colo.App.1991) (involving sanctions imposed for failure to comply with pretrial procedures in civil action), *cert. denied* (May 6, 1991); *see Crow*, 789 P.2d at 1106 (regarding a trial court's ruling denying a motion for a continuance in criminal case); *King v. People*, 785 P.2d 596, 603 (Colo.1990) (regarding trial court's ruling excluding evidence under CRE 403); *People v. Hampton*, 758 P.2d 1344, 1348 (Colo.1988) (regarding trial court's ruling excluding defendant's alibi evidence in a criminal case). Accordingly, the proper inquiry in the present case is whether the successor judge's actions were so manifestly arbitrary or unreasonable as to amount to a clear abuse of discretion.

### B.

The Bank argues that the successor judge was without authority to rule on post-trial motions because the findings of fact and conclusions of law entered by the district court are materially deficient in three respects: there is no finding of fact with respect to the amount of damage; there are no findings of fact regarding the Bank's defense of unclean hands; and there are no findings of fact concerning the content of documents to be used to effect the decree of specific performance. Because the findings of fact are not in sufficient compliance with the Colorado Rules of Civil Procedure, the Bank argues that the successor trial judge was required to grant the Bank a new trial pursuant to C.R.C.P. 63.

In the present case, the trial court first entered findings of fact and conclusions of law on December 13, 1988, prior to trial on summary judgment motions. The district court again provided findings of fact and conclusions of law on January 26, 1989, at the conclusion of trial. The trial court entered a written order, which it termed a "final judgment" and titled "Findings of Fact and Conclusions of Law," on November 30, 1989. The November order was substantially similar to the findings and conclusions provided in January, at the close of trial.

With respect to the amount of fees to be awarded, the Bank argues that the successor judge was required to pass on the credibility of witnesses. The successor judge, however, vacated the district court's award of attorney fees to Friedman, and was thus not required to assess the credibility of witnesses.

With respect to the Bank's defense of unclean hands, the district court first determined that the actions of both the Bank and Friedman were in dispute regarding agreements about management fees and any breach by Friedman of the 1978 Agreement. After trial, however, the district court stated as follows in its January 26, 1989, findings of fact:

> In the fall of 1985, Mr. Friedman did approach the bank to discuss compensation to him for management duties.... The bank contends that Mr. Friedman, according to his statement in his deposition if nothing else, originally approached them saying I want to be paid for my management—for performance of man-

agement duties. Article X of the agreement states that he is not to be compensated for those, for performance of those management duties without agreement.

In any event, it's clear that what the discussion evolved into, if it didn't begin that way, was a discussion of how could Mr. Friedman have continuing quality management for the [mobile home club] having lost a good manager, who ultimately turned out to be a poor one in light of his last acts, but was a good one prior to that time, and then being plagued with a series of managers and a series of problems, and how could he accommodate or handle what he saw as an upcoming vacancy problem?

. . . .

Mr. Garcia testified [for the Bank] that he listened to what Mr. Friedman had to say, and by his own testimony in that meeting and in others had very little to say to Mr. Friedman. One thing he said in one of the first meetings with regard to working out something on management, he said, "Why should I," or "Why should we?"

Frankly, given all of the conversations and actions of the parties, I find the bank's attitude boarding [sic] on cavalier in that respect.

When a man has worked very hard, they had absolutely no criticism of his performance up to that time, he then approaches them saying something has got to happen here, I'm really tired, "why should we" is not an appropriate response.

But in any event, the bank listened, said they would think it over. They were very slow in responding to Mr. Friedman in spite of the fact that he said he had strong reasons for believing he had to act quickly with regard to the sale of mobile homes to prevent a high vacancy rate in the coming year and his need to do something about the management problem.

. . . .

Mr. Friedman, through his lawyers, did become what you might call somewhat aggressive and said I've got to go forward with this and I want you to know that. He kept [the Bank] fully advised. He did not do anything [the Bank] did not know about.

. . . .

... He sent them documents which kept them fully informed of exactly what he was doing. He did set up a management company. . . .

I find that Mr. Friedman's efforts were fully disclosed. They were efforts taken to protect the asset. They were not actions taken which were detrimental to the mobile home [club].

. . . .

I'm finding that the bank did not want to deal with these problems. However, they did not want the "cash cow" to quit paying. So instead of dealing with Mr. Friedman and running the risk that they'd make him mad and have a problem on their hands if they told him no, or on the other hand saying yes when they weren't sure that's what they wanted to do, they sat back and let him go forward. And the only time they absolutely said forget it, we don't want this, was when they told him he'd breached the [1978 Agreement] and he couldn't exercise his option.

... I think to the extent that Mr. Friedman could be deemed to have breached the [1978 Agreement], it was not a substantial breach. . . .

While the acts of the bank may not constitute waiver, they did in effect consent to what Mr. Friedman was doing and certainly did not act in good faith in working with him or negotiating with him or informing him that they had no intention of ever going forward with this. . . .

This being a matter in equity at this point, I do find that specific performance is appropriate.[9]

---

**9.** The district court also found that Mr. Friedman did make distributions under the [1978 Agreement] in 1986. He made them from January through June. The fact that he did not make distributions in the months of July, August, and September prior to the time the option should have been exercised I'm not finding is a breach of the [1978 Agreement]

After trial, the Bank filed a motion for new trial, wherein the Bank argued that the trial court failed to make findings regarding whether Friedman was guilty of unclean hands, and that the Bank was entitled to a new trial on the issues of breach by Friedman. The successor judge denied the Bank's motion "for the reasons set forth on the record." A review of the record, including the district court's findings of fact and conclusions of law, dictates that the successor judge's ruling was not manifestly arbitrary or unfair.

With respect to the documents regarding the decree of specific performance, the district court made detailed findings regarding the amount of the purchase price to be paid by Friedman.[10] The district court also made specific findings regarding execution of the specific performance decree.[11] The district court directed the parties to agree upon the form of the promissory note and the assignment document. The district court also stated that, in the event the parties could not agree, Friedman shall set

the matter for a hearing. The successor judge subsequently ruled that

> the [trial] Court made various findings on the record and ordered the parties to prepare documents in compliance with the Court's order concerning their contents. Said documents shall be prepared by Petitioner's counsel and submitted to Respondent's counsel for approval as to form only. The documents shall be submitted to the undersigned judge on or before February 2, 1990, for final approval.

In so ruling, the successor judge did not act arbitrarily or unreasonably.

■ The Bank's claims are unpersuasive. The court of appeals appropriately determined that the successor judge had discretion to rule on post-trial motions.

## III.

■ The Bank contends that the court of appeals erred by reversing the trial court's dismissal of Friedman's claim of intentional interference with contract. We agree.

> since there were distributions in the year of 1986.
>
> The [1978 Agreement] does not state that there has to be a particular distribution or at a particular time. There was a pattern of monthly distributions....
>
> Mr. Friedman did escrow the amounts ..., but I don't find that there was a breach.
>
> The district court subsequently found, in its findings of fact and conclusions of law entered on November 30, 1989, that
>
>> the bank is entitled to its share of ... profits for June, July and August, 1986. The sum of those profits is $74,346. The face amount of the note to be paid by Friedman to the Bank will include a credit to the Bank for this amount, plus interest.
>>
>> ... The court has found that Friedman's hiring of a management company was not a breach of the 1978 Agreement and that the efforts of the management company benefitted the business, including the Conter ... interest.

10. The district court found that

> the $1,972,250 purchase price for the Conter Estate's interest in the Wikiup Mobile Home Club must be adjusted as follows: $1,972,250, less $350,000 pre-paid by Friedman on June 22, 1988, less interest on $350,000, from June 22, 1988 through November 30, 1989 at 8% *per annum,* pursuant to C.R.S. § 5–12–101 in an amount totalling $40,350, plus $299,903, representing the interest the Bank would have

earned, at 7%, upon Friedman's principal payments had those payments been made by Friedman commencing on January 1, 1987, plus $74,436 for a portion of the 1986 profits, plus interest upon the $74,436 at the statutory rate of 8% in an amount totalling $21,202.

11. The district court found that

> the effective date of [Friedman's] promissory note shall be December 1, 1989. Based on this established date, the Court interprets the provisions of Article XIII to require payment of the purchase price to be made according to the following schedule. One-quarter of the purchase price must be paid to the Conter Estate four months after December 1, 1989, or on April 1, 1990, plus interest at 7% for four months on the face amount of the note. Six months after that date (October 1, 1990) another one-quarter of the purchase price is to be paid to the Conter Estate, plus interest at 7% for the preceding six months on three-quarters of the purchase price.
>
> Six months after that date (April 1, 1991) a third one-quarter payment of the purchase price shall be made to the Conter Estate, plus interest at 7% for the preceding six months on one-half of the purchase price. Six months after that date (October 1, 1991), the final one-quarter payment of the purchase price shall be made to the Conter Estate, plus interest at 7% for the preceding six months upon one-quarter of the purchase price.

The court of appeals held that the tort of intentional interference with contract requires the existence of a contract between a plaintiff and a third party. *Friedman,* 825 P.2d at 1042. Thus, the court of appeals noted that "a party to a contract cannot be liable for tortious interference with that contract." *Id.* The court of appeals stated, however, that "an agent of an organization may be liable for interference with a contractual relationship between that organization and a third party." *Id.* The court of appeals found that

> [t]he [B]ank, as personal representative of decedent's estate, was a "party" to the partnership agreement only in a nominal or representative capacity, as agent of the estate or the heirs. It assumed no *personal* liability to perform decedent's obligations under the partnership agreement. In such circumstances, the courts have held that a personal representative is liable for its tortious interference with a contract between the decedent and a third party.

*Id.* The Bank contends, among other things, that the court of appeals erred in its analysis because there is no "third party" in this case. The Bank's contention is persuasive. The court of appeals concluded that, because it would not be "personally" liable, the Bank could be characterized as a third party for the purposes of Friedman's tort claim. Such a characterization does not square with the tort of intentional interference with contract when the Bank was obligated to perform Conter's obligations under the 1978 Agreement, and when, as the facts of this case indicate, Friedman treated the Bank as if the Bank were Conter, the other party to the contract, for five years prior to Conter's death.

### A.

### Intentional Interference with Contract

■ Colorado has previously recognized the tort of intentional interference with

contract. *Westfield Dev. Co. v. Rifle Inv. Assocs.,* 786 P.2d 1112, 1116–18 (Colo.1990); *Trimble v. City and County of Denver,* 697 P.2d 716, 725–26 (Colo.1985); *Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.,* 690 P.2d 207, 210 (Colo.1984); *Credit Inv. and Loan Co. v. Guaranty Bank and Trust Co.,* 143 Colo. 393, 396, 353 P.2d 1098, 1100 (1960); *see Restatement (Second) of Torts* § 766 (1979). The tort is premised on the existence of a contract between a plaintiff and a third party. *Westfield Dev.,* 786 P.2d at 1117; *Trimble,* 697 P.2d at 726; *Memorial Gardens,* 690 P.2d at 210; *Credit Inv. and Loan Co.,* 143 Colo. at 396, 353 P.2d at 1099–1100. The tortious conduct occurs when the defendant, not a party to the contract, induces the third party to breach the contract, or interferes with the third party's performance of the contract.[12] *Westfield Dev.,* 786 P.2d at 1117; *Trimble,* 697 P.2d at 726; *Memorial Gardens,* 690 P.2d at 210. Under Colorado law, the tort exists to protect parties to a contract; accordingly, it is the conduct of the third person *who is not a party to the contract* that is punished for inducing a breach or preventing performance of the contract. *See Memorial Gardens,* 690 P.2d at 210. As the following discussion indicates, the facts of this case do not satisfy the third-party element of the tort.

### B.

### The Bank's Obligations to Perform the Estate's Contracts

"It is a presumption of law that the parties to a contract bind not only themselves but their personal representatives." *United States ex rel. Wilhelm v. Chain,* 300 U.S. 31, 35, 57 S.Ct. 394, 396, 81 L.Ed. 487 (1937); *see Graybar Elec. Co. v. McClave,* 91 Ariz. 223, 371 P.2d 350, 351 (1962) ("It is well established that execu-

---

**12.** This court has cited with approval § 766 of the *Restatement (Second) of Torts* (1979), which defines intentional interference with performance of contract as a tort wherein "[o]ne ... intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract." *Westfield Dev. Co. v. Rifle Inv. Assocs.,* 786 P.2d 1112, 1117 (Colo. 1990); *Trimble v. City and County of Denver,* 697 P.2d 716, 726 (Colo.1985); *Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.,* 690 P.2d 207, 210 (Colo.1984).

tors and administrators are bound by the covenants and contractual obligations of their decedents that are not personal in nature."); *In re Estate of Spann*, 257 Ark. 857, 520 S.W.2d 286, 290 (1975) ("Contractual obligations which survive the death of the obligor are binding on his executor in his representative capacity ..., and it is the duty of the executor to carry out such contracts."); *In re Estate of Bajonski*, 129 Ill.App.3d 361, 84 Ill.Dec. 672, 676, 472 N.E.2d 809, 813 (1984) ("The general rule is that a contract survives the death of a party."); *Burka v. Patrick*, 34 Md.App. 181, 366 A.2d 1070, 1073 (1976) (" 'On the death of a person all his personal estate passes ... to his executors or administrators, and with it also pass all ... liabilities arising out of contract.' "); *Ballard v. Southwest Detroit Hosp.*, 119 Mich.App. 814, 327 N.W.2d 370, 371 (1982) ("As a general rule, a contract otherwise valid is binding upon a deceased's party's personal representative."), *appeal held in abeyance*, 334 N.W.2d 375 (1983); *Thomas Yates & Co. v. American Legion*, 370 So.2d 700, 701 (Miss.1979) ("Generally, the death of a party does not terminate a contract."); *In re Lipkowitz*, 127 Misc.2d 77, 485 N.Y.S.2d 466, 469 (Surr.Ct.1985) ("[T]he estate of every decedent is liable for the discharge of all obligations and debts incurred by the decedent during his or her lifetime and not discharged at the time of his death."); *Shutt v. Butner*, 62 N.C.App. 701, 303 S.E.2d 399, 401 (1983) ("The general rule is that 'contracts bind the executor or administrator.' "), *review denied*, 309 N.C. 462, 307 S.E.2d 367 (1983);[13] *Ress v. Barent*, 378 Pa.Super. 397, 548 A.2d 1259, 1262 (1988) ("It is ... a general rule of contract law ... that contracts made during a decedent's lifetime are not dissolved by death."); *Hartnett v. Adams & Holmes Mortgage Co.*, 539 S.W.2d 181, 183 (Tex.Civ.App.1976) ("Ordinarily, the legal representative of a decedent is bound by an executory contract of the decedent when its completion does not require personal performance by the decedent."); *see also Uniform Probate Code* § 3–715(3), at 334–37 (1983) (stating that a personal representative who is obligated to perform a decedent's contract has the same alternatives regarding the contractual duties which the decedent had prior to death).

◼ Accordingly, actions premised on breaches of contracts occurring after a party's death are brought against the personal representative of the party's estate. *Burka*, 366 A.2d at 1073; *see United States ex rel. Wilhelm*, 300 U.S. at 35, 57 S.Ct. at 396 (holding that executors are liable on contracts breached after a testator's death); *Graybar Elec. Co.*, 371 P.2d at 351–52 ("[I]f a personal representative does not carry out the contracts of his decedent[,] the other party has a remedy by way of a claim for damages."); *In re Estate of Spann*, 520 S.W.2d at 290 (holding that the executor may be compelled to perform the contract); *Thomas Yates & Co.*, 370 So.2d at 702 (holding that personal representatives are bound to perform contracts entered into by decedents, and may be compelled to pay damages for failure to perform). While bound by a decedent's contracts, the personal representative may breach an agreement and be liable for that breach in the same manner that the decedent would have been had the decedent breached the contract while alive. *See Uniform Probate Code* § 3–715(3), at 337 cmt. (1983).

In the present case, Friedman and Conter stated in the 1978 Agreement that the limited partnership agreement would be binding on the limited partner's personal representative. Upon Conter's death, the Bank was appointed personal representative of Conter's estate. As personal representative of Conter's estate, the Bank is thus obligated to either perform Conter's duties under the terms of the 1978 Agreement, or to be liable in damages for breach to the same extent as Conter may have been lia-

**13.** In *Shutt v. Butner*, 62 N.C.App. 701, 303 S.E.2d 399 (1983), the North Carolina Court of Appeals found no need to resort to the general rule that contracts are binding on personal rep-

resentatives, where the original parties to an agreement provided that it "shall be enforceable against the parties, their personal representa-

ble had Conter himself breached the 1978 Agreement.

The preceding discussion dictates that the Bank cannot be liable for tortiously interfering with the performance of the 1978 Agreement because the Bank is obligated to perform Conter's duties under the 1978 Agreement or be liable in breach. Accordingly, the Bank may not be characterized as a third party capable of interfering with the performance of the agreement. This conclusion is supported by the manner in which Friedman treated the Bank from 1981 through 1986.[14]

The record reveals that, in 1981, Conter created a revocable trust into which he placed his interest in the mobile home club. Friedman subsequently directed all matters concerning the mobile home club to the Bank. For example, Friedman disbursed payments of rents and profits due Conter to the Bank, and sent monthly statements regarding the mobile home club to the Bank. In 1985, Friedman approached the Bank when seeking the limited partner's approval regarding establishment of a management company. Thus, while Conter was living, Friedman treated the Bank as if it were the limited partner to the 1978 Agreement. Under these circumstances, Friedman should not be allowed to claim that, after Conter's death, the Bank was both a party liable for breach of the 1978 Agreement and, simultaneously, a separate third party to the contract between Friedman and the estate.

## IV.

The Bank contends that the court of appeals erred by affirming the district court's determination that the Bank acted in bad faith when ascertaining the value of Conter's interest in the mobile home club. We disagree.

The court of appeals noted that the trial court interpreted the section of the 1978 Agreement that set forth the method by which the value of the limited interest was to be measured. *Friedman*, 825 P.2d at 1040. The court of appeals additionally recounted the conclusion of both the advisory jury and the district court, that "the [B]ank's efforts to obtain a second appraisal upon which to base its valuation of the partnership interest were tinged with dishonesty, bad faith, or the failure to exercise an honest judgment." *Id.* Relying on section 205 of the *Restatement (Second) of Contracts* (1981), the court of appeals reasoned that "there is a covenant of good faith and fair dealing that adheres by law in every contract. And, no fiduciary duty imposed upon a personal representative constitutes a grant of authority to that fiduciary to violate this contractual duty of good faith." *Id.*

The Bank now argues, among other things, that section XIII (setting forth the Option to Purchase) of the 1978 Agreement does not impose a duty on the Bank, and that the clause must be interpreted consistently with the Bank's fiduciary duty to the beneficiaries. The Bank thus posits that its actions in obtaining a second valuation of the limited interest are properly characterized as an act of a fiduciary fulfilling its duties owed to the beneficiaries of an estate.[15] Guided by the general principles of

tives, heirs and assigns." *Id.* at 303 S.E.2d at 401.

**14.** We do not consider whether the Bank may have been liable for intentional interference with contract during the period beginning in 1981 and ending in 1986, in which Conter was still alive and the Bank had assumed the role of trustee. Friedman's claims are premised on actions taken by the Bank after Conter's death.

**15.** The Bank relies on *Rippey v. Denver United States National Bank*, 273 F.Supp. 718 (D.Colo. 1967), *Great Western Producers Co-operative v. Great Western United Corp.*, 200 Colo. 180, 613 P.2d 873 (1980), *Marshall v. Grauberger*, 796 P.2d 34 (Colo.App.1990), *cert. denied* (1990), and

*Murphy v. Central Bank and Trust Co.*, 699 P.2d 13 (Colo.App.1985), in support of its contention. These cases, however, do not involve contract provisions setting forth a price formula for sale of an asset, and are thus not controlling. *Rippey*, 273 F.Supp. at 735–36 (holding that, under a will, trustee had legal power to both sell trust assets at a private sale, and determine the price and terms of such sale); *Great Western*, 200 Colo. at 185–87, 613 P.2d 873 (involving interpretation of "best efforts" clause with respect to approval of sale of company's asset); *Marshall*, 796 P.2d at 37 (holding that husband, under property settlement agreement, had discretionary power to sell stock, limited only by bounds of prudent judgment, reasonableness, and equity).

law discussed in part III, we find that the Bank's contentions are unpersuasive.

■ The 1978 Agreement is binding on the Bank to the same degree that it was binding on Conter during his lifetime because the Bank, as personal representative of Conter's estate, is obligated to perform Conter's contracts. The fact that a fiduciary relationship exists between a personal representative and the beneficiaries of an estate does not relieve the personal representative of the obligation to perform contracts entered into by the decedent during the decedent's lifetime. *See United States ex rel. Wilhelm v. Chain*, 300 U.S. 31, 35, 57 S.Ct. 394, 396, 81 L.Ed. 487 (1937) (holding that a personal representative is obligated to perform a decedent's contracts); *Graybar Elec. Co. v. McClave*, 91 Ariz. 223, 371 P.2d 350, 351 (1962) (holding that executors and administrators are bound by a decedent's contracts); *In re Estate of Spann*, 257 Ark. 857, 520 S.W.2d 286, 290 (1975) (holding that executors are obligated to perform decedent's contracts); *Burka v. Patrick*, 34 Md.App. 181, 366 A.2d 1070, 1073 (1976) (holding that executors and administrators assume all of a decedent's liabilities arising out of contract); *Ballard v. Southwest Detroit Hosp.*, 119 Mich.App. 814, 327 N.W.2d 370, 371 (1982) (holding that personal representatives are bound by a decedent's contracts). Both the decedent and the personal representative can elect to perform the contract, or breach it and incur liability for such breach. *See United States ex rel. Wilhelm*, 300 U.S. at 35, 57 S.Ct. at 396; *Graybar Elec. Co.*, 371 P.2d at 351–52; *In re Estate of Spann*, 520 S.W.2d at 290; *Thomas Yates & Co.*, 370 So.2d at 702; *Uniform Probate Code* § 3–715(3), at 334–37 cmt. (1983).

In the present case, Conter and Friedman entered into an agreement which contained an express provision regarding the valuation method of Conter's interest in the mobile home club after his death. The district court accordingly found that Article XIII "essentially sets forth a formula for buy-

ing out [Conter's] ... interest." The district court reiterated the formula set forth in section XIII as follows:

> The price to be paid shall be equal to the value of the decedent's partnership interest as of his date of death as submitted for federal estate tax purposes.... The Internal Revenue Code, Title 26, Code of Federal Regulations, Section 20.2031–1(b) states that an estate must value its assets at fair market value. This statement must be read into the formula contained in Article XIII of the 1978 Agreement, obligating the Estate to value the ... asset at fair market value.

The district court reviewed testimony presented by Friedman's expert, Mr. Shenkin (Shenkin). The district court determined that Shenkin was qualified to offer testimony as an appraiser, and that his testimony was credible. The district court recounted Shenkin's definition of fair market value, as applied by the Internal Revenue Service, as premised on the existence of a willing seller and a willing buyer. The district court concluded that,

> if one takes Mr. Wampler's appraisal, which was an appraisal done independently in the normal course of business in the normal way that appraisals are done to value assets for estate tax purposes, and discounts this figure by 30 percent, an amount recommended by Mr. Shenkin and normally accepted by the Internal Revenue Service, then you arrive at the amount of $1,972,250.[16]

The district court noted that Harper recommended that the Bank employ a twenty percent discount to Harper's appraisal, and that Harper removed the discount entirely, upon the Bank's request. The district court conversely concluded that the Bank's "valuation improperly assumed an unwilling seller." The Bank "essentially decided that the Estate should be given a bonus for having to let go of its 'cash cow.'" The district court found, according to an employee of the Bank, that "a discount ... must reflect the need to sell and what

---

**16.** The district court adopted Wampler's valuation of the entire mobile home club. The district court did not, however, adopt Wampler's valuation of Conter's interest on the ground that "Wampler was inexperienced in determining discount amounts."

might be considered as a reasonable cash bonus for the remaining partner in order to accommodate the limited partner's need to sell." The district court concluded that "[t]hese are extremely subjective criteria and cannot be extracted from market data because of a lack of comparability. The [c]ourt finds that these are not the criteria for determining fair market value for the purposes of Article XIII of the 1978 Agreement or for federal estate tax purposes."

Both the advisory jury and the district court concluded that the Bank's actions in obtaining a second appraisal constituted a bad faith breach of the 1978 Agreement. Accordingly, the Bank incurred liability for breach. The Bank's contention that, as a fiduciary, it was obligated to obtain the highest price for the interest is without merit. The Bank's fiduciary duty neither extinguishes the Bank's obligations under Article XIII, nor shields the Bank from liability for breach of contract.

The record on appeal supports the findings of the advisory jury and the district court. We conclude that the court of appeals appropriately affirmed the district court's determination that the Bank acted in bad faith.

## V.

Friedman contends that the court of appeals erred by affirming the trial court's conclusion that the evidence was insufficient to support an award of consequential damages for lost profits in the amount of $1,300,000. We disagree.

Generally, "[d]amage awards in contract cases attempt to place the parties in the same financial position they would have occupied had the contract terms been fulfilled." *Republic Nat'l Life Ins. Co. v. Red Lion Homes, Inc.*, 704 F.2d 484, 488 (10th Cir.1983). Where claims for damages are premised on breaches of contracts, "[d]amages that are merely speculative, remote, imaginary, or impossible of ascertainment, cannot be recovered." *Boyle v. Bay*, 81 Colo. 125, 130, 254 P. 156, 158 (1927); *see Lee v. Durango Music*, 144 Colo. 270, 278, 355 P.2d 1083, 1087 (1960) ("Damages

sustained by a business must relate to loss of net profits; they may not be speculative, remote, imaginary, or impossible of ascertainment.")

With respect to lost profits, it is well settled that the profits which would have been realized had [a] contract been performed, and which have been prevented by its breach, are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, or where from the express or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into.

*Red Lion Homes*, 704 F.2d at 489 (quoting *Boyle*, 81 Colo. at 130, 254 P. at 158–59). Profits lost as a consequence of a breach of contract may not be recovered if the profits are too uncertain or unforeseeable at the time that the parties entered into a contract. *Lee*, 144 Colo. at 278, 355 P.2d at 1087; *Boyle*, 81 Colo. at 130–33, 254 P. at 158–60.

Recovery of lost profits is determined by whether the consequences resulting in damages were foreseeable. Lost profits are not recoverable if either the amount of the profit that would have been earned or the fact that the plaintiff would have earned them is too speculative, remote, imaginary, or impossible to ascertain.

*Master Palletizer Systems, Inc. v. T.S. Ragsdale Co.*, 725 F.Supp. 1525, 1535 (D.Colo.1989) (relying on *Prutch v. Ford Motor Co.*, 618 P.2d 657 (Colo.1980), and *Red Lion Homes*, 704 F.2d 484), *aff'd*, 937 F.2d 616 (10th Cir.1991); *see Lee*, 144 Colo. at 278, 355 P.2d at 1087 ("[Loss of net profits] are anticipated profits which have their foundation in the past experience of the concern said to have suffered the loss.").

Friedman claims that both the district court and the court of appeals erred in concluding that he failed to prove that he could have sold the mobile home club for

$6,900,000 in 1987, and that the Bank's actions prevented him from consummating such a sale. The district court concluded that, while Friedman *would* have sold the mobile home club for $6,900,000 in 1987, Friedman failed to prove that he *could* have sold the mobile home club for $6,900,-000 in 1987. Assuming that the parties had reason to foresee a sale of the mobile home club, the record on appeal reveals that Friedman is not entitled to lost profits because he failed to prove that he could have sold the mobile home club for $6,900,-000 in 1987. Friedman's contentions that he is entitled to damages for lost profits are thus without merit. *See, e.g., Lee,* 144 Colo. at 279–80, 355 P.2d at 1088 (holding that a plaintiff may recover lost profits from an interruption of an established business if plaintiff proves the amount of profits by competent proof that is reasonably certain).

### VI.

The court of appeals opinion is affirmed in part, reversed in part, and the case is remanded for further proceedings consistent with this opinion.

ERICKSON, MULLARKEY and SCOTT, JJ., do not participate.